IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CHARLES PHILLIP, | **8:19CV422** |
| Plaintiff, | |
| vs. | **MEMORANDUM AND ORDER** |
| ANDREW M. SAUL, Commissioner of Social Security; | |
| Defendant. | |

This matter is before the court for judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner" or "SSA").[1] This court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3).

## PROCEDURAL HISTORY

Plaintiff protectively filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") on March 31, 2016. He alleged disability beginning April 1, 2014. (Tr. 269-76). The Social Security Administration denied his claims initially, on July 5, 2016, and upon reconsideration, on September 21, 2016. (Tr. 86-159). Plaintiff requested a hearing, which was held on April 18,

---

[1] Plaintiff's complaint was filed on September 24, 2019 (Filing 1). On December 20, 2019, the Commissioner filed an answer (Filing 8) and a certified copy of the transcript ("Tr.") of the administrative record (Filings 9 through 12). The court's General Order No. 2015-05 requires the parties in Social Security cases to file cross-motions for judicial review, and provides that the case will be submitted to the court for decision on briefs, without oral argument. Accordingly, Plaintiff filed a motion for an order reversing the Commissioner's decision (Filing 16) and a supporting brief (Filing 17) on January 28, 2020; the Commissioner then filed a motion for an order affirming his decision (Filing 19) and a supporting brief (Filing 20) on February 27, 2020; and, finally, Plaintiff filed a reply brief (Filing 21) on March 11, 2020.

2018. (Tr. 209-10, 260-65). Plaintiff was represented by counsel and testified at the hearing. A vocational expert also testified. (Tr. 39-85). The administrative law judge ("ALJ") denied Plaintiff's claim on August 27, 2018. (Tr. 12-38). On April 23, 2019, the Appeals Council denied review, so the ALJ's decision stands as the final decision of the Commissioner.[2] (Tr. 3-8).

## ISSUES PRESENTED FOR JUDICIAL REVIEW

Plaintiff argues the Commissioner's decision should be reversed because (1) the ALJ did not evaluate Plaintiff's headaches for medical equivalence under listing 11.02 and (2) the ALJ's RFC finding is not supported by sufficient medical evidence as it relates to the frequency and severity of Plaintiff's headaches. Alternatively, Plaintiff challenges the ALJ's authority to hear his case under the Appointments Clause of the Constitution, Art. II, § 2, cl. 2, and requests that the Commissioner's decision be vacated and the case remanded for a new proceeding.

## DISABILITY DETERMINATION SEQUENCE

The Social Security Administration has promulgated a five-step, sequential process to determine whether a claimant qualifies for DIB and SSI. *See* 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a). At step one, the claimant has the burden to establish that he or she has not engaged in substantial gainful activity since his or her alleged disability onset date. *Cuthrell v. Astrue*, 702 F.3d 1114, 1116 (8th Cir. 2013). At step two, the claimant has the burden to prove he or she has a medically determinable physical or mental impairment or combination of impairments that significantly limits his or her physical or mental ability to perform basic work activities. *Id.* At step three, if the claimant shows that his or her impairment meets or equals a presumptively disabling impairment listed in the regulations, he or she is automatically found disabled and is entitled to benefits.[3] *Id.* If not, the ALJ

---

[2] On August 20, 2019. Plaintiff received an extension of time to file a civil action from the Appeals Council. (Tr. 1). Plaintiff's complaint was timely filed.

[3] To establish equivalency, a claimant must present medical findings equal in severity to all the criteria for the one, most similar, listed impairment. *Cronin v. Saul*, 945 F.3d 1062, 1067 (8th Cir. 2019).

determines the claimant's residual functional capacity ("RFC"), which the ALJ uses at steps four and five. At step four, the claimant has the burden to prove he or she lacks the RFC to perform his or her past relevant work. *Id.* If the claimant can still do his or her past relevant work, he or she will be found not disabled; otherwise, at step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy the claimant can perform. *Id.*

THE ALJ'S DISABILITY DETERMINATION

In evaluating Plaintiff's claim, the ALJ followed the sequential evaluation process. First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of April 1, 2014. (Tr. 18). Second, the ALJ found that Plaintiff has the following severe impairments: discogenic and degenerative disorders of cervical and thoracic spine; depressive disorder; anxiety disorder, intellectual disorder, and headaches. (Tr. 18). The ALJ stated:

> The above medically determinable impairments significantly limit the ability to perform basic work activities as required by SSR 85-28.

> During the hearing, the claimant claimed he "constantly—everyday has pain", his allegations of constant pain and related symptoms have been taken into consideration as part of the severe impairments identified above.

> The mental health condition of depressive disorder and anxiety disorder (Ex. [B]20F/4 [Tr. 1553]) are used to capture the claimant's alleged mental health impairments, however, the undersigned acknowledges there have been references to a mood disorder, PTSD, and other conditions, as discussed below, the undersigned has considered all the claimant's mental health symptoms despite their precise etiology.

> The claimant has alleged a multitude of physical ailments affecting nearly his entire body. He has sought care for bumps under his right eye and the record shows that he has a cyst under his right eye but he is followed by an ophthalmologist who states the fat pad and cyst are stable and do not cause problems and there is no sign of any alleged

3

progressive orbital disease. (Ex. B2F/23, 58-59, 61 [Tr. 422, 457-58, 460]; B12F/5 [Tr. 690]). He also has a reported dry eye condition and "thyroid eye disease" but the substantial treatment records support a finding that these conditions cause no vision restrictions or cause more than minimal limitations in the claimant's ability to engage in basic work activities; therefore, these conditions are nonsevere.

The claimant brought an exhibit to his hearing that shows carpal tunnel syndrome as part of a "problem list" but it referenced no objective studies or examination findings. It was under a category called "problem list" (Ex. [B]21F/2 [Tr. 1562]) and he alleges arthritis in his right thumb and wrist, however, x-rays from February 2016, show normal findings, with no degenerative changes and during the relevant period, his exams show normal grip strength. (e.g., Ex. [B]2F/50-51, 152, 155 [Tr. 449-50, 551, 554]).

The treatment records do not document any specific limitations caused by these alleged conditions reflective of an impairment that would cause more than minimal limitations in the claimant's ability to perform basic work activities; therefore these conditions are nonsevere. He also had a biopsy of his second phalanx (his broken toe impairment) in 2012 but more recent examinations document his gait and station are normal and there is no documented medical residuals from this alleged condition (e.g., Ex. B1F/7-8 [Tr. 388-89], B2F/24 [Tr. 423]; B3F/16 [Tr. 599]); therefore any alleged residuals from his broken toe are nonsevere.

The claimant has also alleged his ability to work is affected by problems with his right knee and left forearm, although imaging studies on both in 2016 were unremarkable. (Ex. [B]2F/50-51 [Tr. 449-50]). There is no objective physiological or medical opinion supportive of a medical condition; therefore, these are nonmedically determinable impairments and would be "non-severe" in any event. In 2008, he was involved in a motor vehicle accident and attributed his low back pain to this accident. (Ex. [B]14F/1, 3 [Tr. 844, 846]). Additionally, the claimant has alleged numbness and tingling in his left upper extremity but his EMG in 2008 was normal. (Ex. [B]14F/29 [Tr. 714]). The claimant worked many years after 2008 with these conditions and the record supports a finding

they cause no more than minimal limitations in the claimant's ability to perform basic work activity and are nonsevere.

He first complained of left shoulder pain back in 2008 and saw a Workmen['s] Compensation doctor who diagnosed him with a left shoulder tear (Ex. B14F/1, 7 [Tr. 844, 850]; B18F/49 [Tr 1541]). He reported left upper extremity numbness and tingling, however, his EMG in 2008 was normal. (Ex. [B]14F, p. 29 [Tr. 714]). He claimed low back pain in conjunction with this injury but then reported no numbness, weakness, or tingling in his lower extremities. (Ex. [B]14F/1, 3 [Tr. 844, 847]; B18F/49 [Tr. 1541]). The claimant alleges limited shoulder movement and there is reference to a left rotator cuff tear diagnosed in 2008 (Ex. [B]14F/1 [Tr. 844]) and "subtle partial thickness supraspinatus tear" (Ex. [B] 14F/1 [Tr. 844]), however, during the alleged period of disability, the record supports a finding that this condition causes no more than minimal limits in the claimant's ability to engage in basic work activities.

In May 2017, the claimant reported shortness of breath and stated he is using his albuterol inhaler 4 times in one day. He noted that he has associated shortness of breath going up the stairs at home. (Ex. B12F/54 [Tr. 739]). However, a review of the record shows this is an intermittent condition and when he properly wears his CPAP at night his symptoms are largely controlled and cause no more than minimal limitations in his ability to perform basic work activity.

In November 2016, there is a reference to the claimant reporting what "sounds like a vasovagal syncope" (Ex. [B]16F/102 [Tr. 1291]) but the medical records show he has had no further reported occurrence and "he needed to pick up his antihypertensives". (Ex. B16F/102 [Tr. 1291]). There medical record document that he is switching "back and forth" from clinics for treatment and he is instructed to seek care from one clinic. (Ex. B16F/102 [Tr. 1291]). The claimant has a medically documented history of hypertension, however, studies of the heart have raised no significant concerns and the claimant's hypertension is controlled by medications, when he is compliant. Records raise no ongoing concerns regarding his reported syncope. Accordingly, these conditions are nonsevere.

The claimant's BMI was just over 30 at the time of filing in 2018 and the record establishes during the relevant time period, the claimant had a BMI range of 30.20 to 32.61. The record reflects he was counseled on strategies for weight loss that recommended, "regular walking". (Ex. B12F/36 [Tr. 721]). The undersigned has considered the claimant's obesity as required by SSR 02-lP and finds the medical records support a finding that the claimant's obesity may have some limiting effects on the claimant, in particular, on his musculoskeletal, respiratory, and cardiovascular symptoms, but overall the claimant's obesity is a non-severe impairment, as it would not result in limitations beyond those already accounted for as a result of the above-noted "severe" medically determinable impairments.

During the relevant period, the medical records show he presented smelling like marijuana and admitted to using the day before, however, any illicit drug use is documented intermittently in the record and therefore the undersigned finds it is nonsevere and not material. (Ex. B2F/97 [Tr. 496]).

Any diagnosis, ailment, or condition not specifically setout herein was not severe as it was either well controlled by medication, well managed, causes no more than minimal limitations, or otherwise transitory and quickly resolved.

(Tr. 18-20 (footnote omitted)). Third, the ALJ found that Plaintiff's impairments do not meet or equal the Listings of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. More specifically, the ALJ found that Plaintiff's cervical and thoracic conditions do not meet or equal the criteria of listing 1.04, and the severity of his mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.05, 12.06, and 12.15. (Tr. 20).[4] The ALJ then determined Plaintiff's RFC, stating:

---

[4] The ALJ did not discuss whether Plaintiff's headaches medically equal the criteria of listing 11.02. However, the ALJ did discuss Plaintiff's headaches at some length as part of his RFC determination. For ease of reference, the court has italicized those portions of the discussion.

[T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) involving occasional climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; no exposure to workplace hazards (unprotected heights, moving mechanical parts); and crouching. He is able to perform simple and routine tasks; make simple work-related decisions; and have occasional contact with the public.

(Tr. 24-25). The ALJ explained:

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 16-3p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927.

* * *

*In April 2016, as part of his application for disability, the claimant provided he had extreme limitations because of his headaches and asserted he stayed home and does not do much because of pain from his headaches.* (Ex. B5E/1 [Tr. 321]). However, he also noted that he is able to drive about 1 or 2 hours at a time, drive his car to the store and bank to run errands, do laundry, and watches the news and sports. (Ex. B5E/1-2 [Tr. 321-22]). He alleged he cannot sit long because of his back pain, cannot stand long because of back pain, and walking hurts because of his broken toe. (Ex. B5E/2 [Tr. 322]). *He asserts that he has had bad headaches since 1971-1972 and that he is in pain "24/7".* (Ex. B5E/3 [Tr. 323]).

*At his hearing, he testified his headaches are disabling and he fears that someone is trying to hurt him. He asserted he gets headaches "every day", "all day" and that half of his head feels numb because of headaches. He then stated he had been having headaches like this since he was six years old and the headaches were worse when he was in 4th and 5th grade and that is how the headaches are now. He stated he only has 3 or 4 days per moth [sic] where his head does not hurt.* He asserted his back has been "hurting for years" and his shoulders hurt "all the

time." He denied being to lift "any weight" because his wrist is "all messed up." He explained he can only sit for about 30 to 45 minute and he can stand approximately 40 minutes at a time. He suggested he does not like to leave the house or be around a lot of people because of his mental health conditions. He feels that when he hit his head as a child that this injury has "messed up his whole life." Inconsistent with this allegation is the claimant's work history showing he was able to engage in semi-skilled work activities at a medium exertional level for many years.

He further stated it is hard to focus because he is always thinking about ''the fall'' he had when he was a child. However, he indicated he lives alone, cleans his own house, does laundry, shops, and pays his own bills.  He stated that at one time, he had custody of his son but his son is now 33 years old. He provided he attended special education through the 8th grade but was unable to obtain his GED because he could not concentrate. However, inconsistent with that allegation, during the alleged period of debility the record shows he has a drivers' license and drove around performing errands, demonstrated he knows how to use a smart phone, watches TV, remembers and understands how to access and watch videos on Youtube and music from his smart phone, completed necessary forms, applied for Title 8 assistance, and was capable of writing a letter that provided his history and argument for disability. Further, he worked in 2016 at another semi-skilled job and reported he quit, not because of mental limitations, but because it bothered his eyes and sinuses and was a "lot of heavy lifting".

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

At the initial level the claimant alleged disability based on a brain injury, severe headaches, high blood pressure, depression, severe arthritis in his neck and shoulder, torn rotator cuff, arthritis in his right thumb, lasting effects of a broken toe, bumps underneath his right eye,

and high cholesterol. Physically, during the period of alleged disability, he has alleged problems with essentially every part of his body, however, his allegations as to the severity and persistent nature of his physical conditions is not supported by the substantial evidence of record.

The claimant's work record shows he worked for many years after the alleged onset of his multiple conditions. He testified he had worked as a mechanic and "grease monkey" and both jobs demonstrate an ability to perform simple and routine tasks long after his alleged onset, which he contends occurred when he was a child and hit his head on the ice. (Ex. B14E [Tr. 365]).

In September 2013, the medical records show multiple complaints made by the claimant but no specific cause for his alleged symptoms. (Ex. B1F/7 [Tr. 388]). His objective tests and labs were normal, he had a normal gait, normal psychiatric findings, normal ROM in his upper extremities, and normal range of motion of his neck. (Ex. B1F/7-8 [Tr. 388-89]). *Then, after filing for disability, in September of 2015, he reports he has had neck and back pain for about four years and that his chronic headaches started more than one year ago.* (Ex. B2F/65 [Tr. 464]). He reported to his provider that he had a "persistent learning disability and is undergoing evaluation for disability." (Ex. B2F/66 [Tr. 465]). The medical record documented that the claimant brought paperwork for disability with him but the medical records noted, "he does not have any pertinent problems on file." (Ex. B2F/66 [Tr. 465]). On September 20, 2015, the medical records show the claimant reported he injured himself while changing a flat tire. (Ex. B2F/70 [Tr. 469]). The provider reviews the objective imaging and finds there is "early, minimal" degenerative changes in his lumbar spine and the claimant was diagnosed with a "back sprain". (Ex. B2F/73 [Tr. 472]). *In 2015, he intermittently seeks treatment for headaches and consistently reported he has had headaches since he was young.* (e.g., Ex. B2F/74, 78 [Tr. 473, 477]). *He denied any nausea, vomiting, phonophobia, and photophobia associated with his headaches.* (Ex. B2F/65, 74 [Tr. 464, 473]). *He reported that Toradol helped with his headaches for 3-4 days.* (Ex. B2F/65 [Tr. 464]). In December 2015, he participated in physical therapy for his complaints of neck but admitted he was noncompliant with his home exercises and was instructed to

9

perform his stretches at home. (Ex. B2F/94 [Tr. 493]). There therapy records also document noted gaps between his physical therapy sessions. (Ex. B2F/11 [Tr. 410]).

In January 2016, the medical records show a treatment plan for his reported neck pain that includes an occipital nerve block. (Ex. B2F/125 [Tr. 524]). *In February 2016, the claimant reported the injection helped with his neck pain but that he was still having headache and eye pain.* (Ex. B2F/128 [Tr. 527]). He also provided he believed therapy was helping him and he was turning his head a little further when driving. (Ex. B2F/128 [Tr. 527]). Inconsistent with the claimant's reports during physical therapy, during his physical exam he was noted to have a normal range of motion. (Ex. B2F/133 [Tr. 532]). Additionally, he was negative for myalgias, arthralgias and neck stiffness; and his neck had a normal range of motion with no tenderness present. (Ex. B2F/133 [Tr. 532]). This is just one example of the inconsistencies between the self-reports the claimant gives and the findings during examinations. The therapy discharge record documented that it is "suspected" the claimant is "self-limiting out of apprehension" and "he demonstrated full function without observable pain while managing his toddler today." (Ex. B2F/140 [Tr. 539]). Additionally, the medical records show that inconsistencies between his consistently reported high pain level while also showing improvement in cervical range of motion and an ability to perform activities of daily living. (Ex. B2F/140 [Tr. 539]).

On February 25, 2016, the claimant reported that someone tried to hit him with a car and he was struck on his right knee, has pain in his right shoulder, right hand, and left forearm. (Ex. B2F/152 [Tr. 551]). He described picking up a crowbar and chasing the person away and now stated he has neck pain. (Ex. B2F/152 [Tr. 551]). The imaging of his knee, shoulder, forearm, and hand is normal. (Ex. B2F/155 [Tr. 554]). The imaging of his cervical spine shows normal alignment and mild degenerative disc disease with moderate facet arthropathy at C4-C5 and advanced right C3-4 facet arthropathy with subchondral cystic changes. (Ex. B2F/157 [Tr. 556]) The claimant denied joint pain or swelling and depression. (Ex. B2F). The medical records document that the claimant does not appear seriously injured, he is comfortable, and he was discharged with pain medications. (Ex. B2F/157 [Tr. 556]).

*On March 13, 2016, he underwent treatment for "possible" migraine cluster but lab studies were negative, objective imaging was "unremarkable", and he reported his headache resolved with medication.* (Ex. B2F/1, 3 [Tr. 400, 401]). *The medical records in March 2016 show a treatment plan for complaints of chronic tension headaches, chronic neck pain, and depression.* (Ex. B2F/7 [Tr. 406]). *On March 18, 2016, the claimant reported a persistent headache and that he took four Percocet the day before and this did not help his headache.* (Ex. B2F/10 [Tr. 409]). *Again, the medical records show he reported that his fell [sic] on the ice at age seven and this has caused headaches ever since. Then he reported he was in an accident two years ago and that is why his headaches have gotten worse.* (Ex. B2F/10 [Tr. 409]). Interestingly, though the medical record[s] from Nebraska Medical Center document that the claimant is "seen regularly" for complaints of pain (Ex. B2F) there is a notation that "he does not have any pertinent problems on file." (Ex. B2F/10 [Tr. 409]). In April 2016, he is negative for back pain, has no gait problems, and is negative for weakness. (Ex. B2F/24 [Tr. 423]). In 2016, the medical records further indicate the claimant "does home exercise program consisting of stretching" and he had "no apparent distress", his "interpersonal behavior" is "socially appropriate", and his "mood appropriate." (e.g., Ex. B2F/13, 25, 168, 179 [Tr. 412, 424, 567, 579]). A workup performed Dr. Jason G. Langenfeld, on May 23, 2016, indicated that the claimant is "well appearing with normal vital signs" and an "overall low risk of severe pathology" based on labs and examination of the claimant. (Ex. B3F/21-22 [Tr. 604-05]).

*As for the claimant's headache condition, the record shows he reported having headaches since the second grade, as a consequence of a head trauma.* (Ex. B2F/171 [Tr. 570], B4F/1 [Tr. 617]). *In 2016, he was treated intermittently for headaches and reported improvement with medication.* (e.g., Ex. B2F/25 [Tr. 424]). *In fact, in May 2016, he reported no headaches* (Ex. B3F/20 [Tr. 603]) *but then in June 2016, he reported "daily headaches.* (Ex. B4F/1 [Tr. 617]). *The medical records show the claimant reported he has a past history of chronic headaches and that his headaches have "been more or less the same*[.]*"* [A]*dditionally, his work activity records support a finding that he has worked many years with this reported chronic headache condition. However, because the claimant reported he had no relief from his daily*

11

*headaches, in July 2016, Botox injections were recommended.* (Ex. B6F/5 [Tr. 636]). *The medical records show that as of January 2017, his chronic headaches are considered to be "stable" and his symptoms were improved with Botox therapy.* (Ex. B12F/6 [Tr 691]). *Then in March 2017, the claimant reported he is no longer taking headache medications and reported post Botox injection he has 60% improvement.* (Ex. B12F/25 [Tr. 710]). *The record shows the claimant reported he has filed for disability for headaches and reported he continues to have daily headaches.* (Ex. B12F/29 [Tr 714]).

*In May 2017, the claimant now reports "significant relief of pain" from his Botox injections.* (Ex. B12F/79 [Tr. 764]) *acknowledging the intensity and severity has improved by 90% compared to his baseline.* (Ex. B12F/79 [Tr. 764]). *However, the claimant goes on to report that he still is having one headache per day (30 per month) that can range from 2-20 hours.* (Ex. B12F/79 [Tr. 764]). *The medical records show that he "does not employ strategies of medication, yoga, distraction, and engaging in activities to decrease pain thoughts and symptoms."* (Ex. B12F/79 [Tr. 764]). *In July 2017, the medical record shows the claimant reported he had "0-2 out of 10 pain or no headaches" at all following Botox injections for 9-12 weeks after the injection.* (Ex. B12F/85 [Tr. 770]). He reported that his trigger point injections were very helpful relieving his neck pain. (Ex. B12F/85 Tr. 770]). *However, he admitted that he does not take any medications to help with pain relief or migraine prevention.* (Ex. B12F/85 [Tr. 770]). *In August 2017, there is additional improvement in his headache condition and he reports receiving 95% relief and only 5 headaches per month and in October 2017 only 3-4 headaches per month.* (Ex. B12F/92, 101 [Tr. 777, 786]). The medical records show the claimant reported being more functional with fewer trips to the emergency room and curiously he stated he is "missing less days of work." (Ex. B12F/92 [Tr. 777]). *In consideration of his headaches, which he now reported receiving 95% relief from symptoms, the undersigned has included limitations of no exposure to work hazards, heights, or moving mechanical parts.*

However, he now complained his bilateral shoulder and neck pain has returned. (Ex. B12F/92 [Tr. 777]). There is some imaging from 2015 that shows thoracic spin and cervical spine with "minimal" degenerative changes, "mild" disc disease, and "age-related cervical

12

spine changes." (Ex. B2F/40 [Tr. 439]). In February 2016, cervical imaging shows degenerative cervical spondylosis with facet arthrosis at C2-3, C3-4, and C4-5 (Ex. B2F/48 [Tr. 447]) and the claimant's shoulder showed "mild" degenerative joint disease. (Ex. B2F/49 [Tr. 448]). In August of 2016, the medical records show no joint pain, no joint swelling, and no depression. (Ex. B4F/1 [Tr. 617]). Giving the claimant's testimony due consideration and in order not to exacerbate these conditions, he is limited to light exertional activities. (Ex. B2F/40 [Tr. 439]). The undersigned further limits him to frequent postural maneuvers as identified above and finds he is able to climb stairs and ramps occasionally but should never climb ladders, ropes, or scaffolds. These limitations consider his larger habitus and back condition. During the relevant time period, the claimant reported taking Norco 7 at home that was provided to him by a relative and states to a provider that Norco seems to help his body aches. (Ex. B12F/42 [Tr. 727]). Although the record provided little in support of a physiological cause for the claimant's reported pain, Norco was ordered for pain control. (Ex. B12F/45 [Tr. 730]).

As for the opinion evidence, on November 26, 2013, during a previous claim, the claimant underwent a physical consultative examination and reported he had "bone disease" and when asked which joints hurt he reported "all of them." (Ex. B19F/1 [Tr. 1542]). This report endorsed that the claimant is "likely" unable to perform strenuous activities or lift heavy objects, primarily due to his shoulder complaints. (Ex. B19F/7 [Tr. 1548]). The undersigned gives partial weight to this report because it was based on an examination of the claimant but notes it does seem to rely on the claimant's "complaints" of shoulder pain. The undersigned noted this reports [*sic*] is prior to the alleged onset date and the undersigned has added limitations, given the weight of evidence of the record as a whole.

On July 1, 2016, at the initial level, the Disability Determination Services' physical assessment concluded the claimant had no exertional limitations but had postural limitations of frequent climbing ramps and stairs; frequent balancing; occasional climbing of ladders, ropes, and scaffolds; and unlimited stooping, kneeling, crouching and crawling. (Ex. B3A/11 [Tr. 98]; B4A/11 [Tr. 114]). This determination included that the claimant should avoid all environmental factors. (Ex. B3A/11

[Tr. 98]; B4A/11 [Tr. 114]). At the reconsideration level, on September 20, 2016, the assessment endorsed no exertional limitations. However, postural limitations of frequent climbing of ramps and stairs; frequent balancing; occasional climbing of ladders, ropes and scaffolds; and unlimited stooping, kneeling, crouching and crawling were found. (Ex. B7A/13 [Tr. 134]; B8A/13 [Tr. 153]). The reconsideration determination also included that the claimant should avoid all environmental factors. (Ex. B7A/13-14 [Tr. 134-35]; B8A/13-14 [Tr. 153-54]). In consideration of the claimant's testimony, the undersigned finds the claimant is limited to light exertional activities. The undersigned gives these assessments some weight in finding that the record does not support physical limitations to the extent alleged by the claimant.

On July 15, 2016, Dr. Douglas H. Wheatley opined the claimant was "disabled["]. (Ex. B5F/1 [Tr. 630]). On July 15, 2016, the claimant had requested a "work note" from Dr. Wheatley stating that he is "unable to complete" a work schedule secondary to his pain and stated he was pursing [sic] disability. (Ex. B6F/1 [Tr. 632]). On August 1, 2017, Dr. Wheatley completed a form again indicating that the claimant's "diagnosis prevent [the claimant] from working." (Ex. B11F [Tr. 680]). Taken together, Dr. Wheatley has essentially found that the claimant is "disabled" and "unable to work." However, his conclusions in both documents are quite conclusory and vague, with little indication of the specific limitations giving rise to such a conclusion. As such, they were given limited weight by the undersigned.

In sum, the undersigned finds the claimant has the above residual functional capacity assessment, which is supported by his testimony, documented activities of daily living, objective medical evidence, course and care of treatment, mental health treatment records, and those medical opinions found to be consistent with the substantial evidence of record.

(Tr. 25-30 (emphasis supplied)). Fourth, the ALJ found Plaintiff could not perform his past relevant work as a bus driver, truck driver, lubrication technician, auto detailer, or construction worker. (Tr. 30). Fifth, and finally, considering Plaintiff's age (47, as of the disability onset date), education (limited), work experience, and RFC, the ALJ found that Plaintiff can perform other light unskilled work as a laundry

sorter, laundry folder, and assembler small part, and, consequently, that he is not disabled. (Tr. 30-31).

RELEVANT MEDICAL RECORDS[5]

On April 8, 2015, Plaintiff saw Dr. William Hay, M.D., at the University of Nebraska Medical Center, for primary care with abdominal pain and other complaints. (Tr. 1001-03).

On July 23, 2015, Plaintiff sought treatment for chest pain and shortness of breath issues at the Nebraska Medical Center's emergency department. (Tr. 1007).

On July 26, 2015, Plaintiff followed with primary care. Plaintiff reported he had been feeling ill for over a week and had pain in his neck and a headache. He reported having a syncopal episode while sitting on the couch, which had not occurred before, nor had it recurred. Plaintiff also discussed his history of "ocular proptosis" of unclear etiology. (Tr. 1014). Dr. Hay ordered thyroid labs. (Tr. 1017). On July 29, 2015, Plaintiff returned to Dr. Hay. He reported headaches and pain in his lower right leg, left elbow, and toes. (Tr. 1017). Dr. Hay suggested the myalgias and fever were related to a viral condition. (Tr. 1024). Early degenerative disc disease was noted in a cervical spine x-ray. (Tr. 1436).

On August 3, 2015, Plaintiff sought emergency department treatment at the Nebraska Medical Center for diffuse body aches, radiating to his head and face, diffuse back aches, constant chest pain, and mild dizziness on standing. (Tr. 1027). A head CT showed proptosis related to abundant orbital fat and was otherwise

---

[5] The summary of medical records set forth in this section was prepared by Plaintiff in the first instance (*see* Filing 17 at 7-21), but the court has made certain corrections and deletions, and has added pertinent information in footnotes. The Commissioner concurred with Plaintiff's summary. (*See* Filing 20 at 2). For ease of reference, the court has also italicized those portions of the medical records summary which have been identified by Plaintiff as bearing directly upon the issue of whether the ALJ failed to make a proper step-three determination regarding the equivalency of Plaintiff's headaches to a listed impairment. (*See* Filing 17 at 23-26).

normal. (Tr. 1437). The provider noted: "Pt with hypokalemia, body aches, cervical myofascial pain, tension headache, constant chest pain, non-exertional" and ordered labs and an outpatient follow up. (Tr. 1031).

*On August 13, 2015, Plaintiff saw Dr. Hay for primary care concerning his myalgias and headaches.* (Tr. 1032). *Dr. Hay planned additional labs and performed a Toradol injection for Plaintiff's headache.* (Tr. 1036).

*On August 27, 2015, Plaintiff returned to Dr. Hay and reported his myalgias and headaches were not improved.* (Tr. 461, 1036). *Dr. Hay prescribed tramadol and performed another Toradol injection, and refilled citalopram for Plaintiff's depression.* (Tr. 464, 1039).

On September 14, 2015, Plaintiff saw Dr. Andrea Jones, M.D., in Dr. Hay's office concerning his headache issues. He reported his pain was 8 out of 10 in severity and only received mild relief from ketorolac injections, Excedrin and acetaminophen. Tramadol was not helping. Toradol lasted for 3 to 4 days. Plaintiff explained that he had persistent learning disability after falling on the ice and hitting his head in the second grade and reported difficulty with concentration, inability to focus, and memory problems. (Tr. 464, 1040).[6] Dr. Jones provided Sulindac to try

---

[6] Plaintiff provided the following history to Dr. Jones: "This is a chronic problem. The current episode started more than 1 year ago. The pain is located in the bilateral, retro-orbital and frontal region. The pain does not radiate. The pain quality is similar to prior headaches. The quality of the pain is described as stabbing. The pain is at a severity of 8/10. Associated symptoms include facial sweating and nausea. Pertinent negatives include no eye pain, eye watering, phonophobia, photophobia, sinus pressure or vomiting. Associated symptoms comments: He reports seeing a 'purple light on the right side' when closing his eyes. Nothing aggravates the symptoms. He has tried ketorolac injections, Excedrin and acetaminophen for the symptoms. The treatment provided mild relief. His past medical history is significant for hypertension. There is no history of migraines in the family or sinus disease…. He takes Tramadol for his headaches but states that it does not help. He states he has a daily headache and there are no identifiable triggers. He notes the Toradol helps and lasts 3-4 days…. The neck and back pain have been

for headaches, continued tramadol as needed, and referred him to neurology. Dr. Jones prescribed Flexeril for trapezius muscle spasms. (Tr. 467, 1043).

On September 20, 2015, Plaintiff sought emergency department treatment for low back pain following trying to lift the trunk cover before realizing there was a heavy jack on top of the cover. (Tr. 468-69, 1044-45). The impression was back strain and he was discharged. (Tr. 472, 1048).

On November 5, 2015, Plaintiff saw Dr. Marco Gonzalez, M.D., a neurologist, at a vascular neurology clinic, for evaluation of his headaches. (Tr. 472-73, 1048-49). Plaintiff explained he had headaches since his fall in second grade that had increased in the last two years following a motorcycle accident. He reported daily headaches for the past year or so. Pain usually was associated with neck stiffness and restricted range of motion and was 7 out of 10 and could increase to 10 out of 10. Sulindac had not helped. (Tr. 473, 1049).[7] Dr. Gonzalez noted the symptoms and exam were suggestive of a chronic tension-type headache. Dr. Gonzalez started gabapentin and continued ibuprofen as needed. (Tr. 476, 1052).

*On November 27, 2015, Plaintiff saw Dr. Hay for follow up concerning his neck pain and headaches. He was concerned with cracking with neck motion and swelling of his eyes, in addition to his neck and headache pain.* (Tr. 477, 1053). *Dr.*

---

bothering him for about 4 years." (Tr. 464, 1040). Dr. Jones' diagnosis was "chronic tension-type headache, not intractable; other chronic pain." (Tr. 467, 1043).

[7] Plaintiff provided the following history to Dr. Gonzalez: "[H]e has had headaches since [he was] young. These started in second grade as a consequence of head trauma. His headaches have been more or less the same with the exception of the frequency and intensity that has increased in the last 2 years. He had a motorcycle accident 2 years ago and since then his pain has worsen[ed]. For the last year or so he has had daily headache. He describes his current headache as dull, pressure like pain, located in the occipital area radiating to the vertex associated with neck stiffness and restricted range of motion. The pain is usually a 7/10 but can increase to 10/10. He denies other symptoms associated to the pain such as nausea, vomiting, phonophobia, and photophobia He has tried multiple medications for his headaches without improvement. More recently he was started on sulindac without improvement." (Tr. 473, 1049).

17

*Hay performed a Toradol injection and ordered a cervical spine MRI.* (Tr. 480, 1056). On November 27, 2015, the MRI was performed which showed mild multilevel age-related cervical spine changes. (Tr. 439-40).

On December 9, 2015, Plaintiff sought emergency department treatment for headache, neck pain, and chest pain. (Tr. 481, 1057).[8] A stress test and labs were ordered to further assess chest pain and Norco was provided for severe headache pain. (Tr. 489, 1065).

On December 18, 2015, Plaintiff began physical therapy for his neck pain.[9] Plaintiff complained of headaches as well.[10] Plaintiff explained he could not lift or bend over. (Tr. 493, 1069).

On December 19, 2015, Plaintiff sought emergency department treatment for dizziness concerns. (Tr. 496, 1077).

*On January 7, 2016, Plaintiff saw Dr. Hay for primary care. Plaintiff reported he felt no change in his headaches and requested a Toradol shot and pain medication for his headaches. Plaintiff had not had a recurrence of syncopal symptoms.* (Tr. 504, 1087). *Dr. Hay increased gabapentin and performed a Toradol injection and*

---

[8] Plaintiff provided the following history to the ER physician: "Patient has history of chronic headache and neck pain for which she [*sic*] has had a CT scan in August and a MRI of the neck last month. Neither of the previous scan[s] showed any etiology for the pain. Patient is not experiencing any upper or lower extremity weakness, paresthesias, fevers, night sweats or unremitting pain. Headache is the same as previous however just increased in intensity.... Plaintiff is also on 3 different blood pressure medications which he did not take this morning due to his headache. Patient at this time denies any ... lightheadedness, nausea, vomiting, weakness ...." (Tr. 481).

[9] Plaintiff continued physical therapy for his neck pain on December 21 and 31, 2015 (Tr. 501, 503), January 15, 18, 20, and 25, 2016 (Tr. 509, 511, 516, 518), February 1 and 5, 2016 (Tr. 526, 528). He was discharged from physical therapy on February 10, 2016 (Tr. 538-40).

[10] Plaintiff "indicated the headaches are in the back of his head, front of head and in his eyes." (Tr. 493, 1069).

*noted the pre-syncope workup appeared benign with no recurrence and could just be watched for now.* (Tr. 508-09, 1091).

On January 19, 2016, Plaintiff returned to Dr. Gonzalez in vascular neurology. Plaintiff reported little improvement and radiating symptoms to his left eye. (Tr. 513, 1096). Dr. Gonzalez continued gabapentin, added amitriptyline, started a trial of indomethacin, continued physical therapy, and referred Plaintiff for a pain medicine assessment. (Tr. 515, 1098).

*On January 27, 2016, Plaintiff saw Dr. Megan Christensen, M.D., in pain medicine, for evaluation of his neck and headache pain.* (Tr. 519-20, 1102-03). *Dr. Christensen explained his pain was likely multifactorial and proceeded with a trigger point injection and occipital nerve block.* (Tr. 524, 1107).[11]

*On February 8, 2016, Plaintiff sought treatment for headache and chest pain.* (Tr. 530, 1113). *A CT scan of his head was performed.* (Tr. 445, 1118-19). *Plaintiff was discharged following Reglan and Benadryl injections.* (Tr. 536-38, 1119-20).[12]

*On February 14, 2016, Plaintiff sought emergency department treatment at Nebraska Medical Center for headache that radiated to the occipital region.* (Tr. 540, 1124).[13] *He was provided Toradol, Benadryl and Reglan injections and discharged.* (Tr. 543, 1126).

---

[11] Dr. Christensen's assessment was "evidence of chronic headache associated with occipital neuralgia, myofascial pain, cervical spondylosis." (Tr. 524, 1107).

[12] The ER physician's diagnosis was "chronic tension-type headache, not intractable." (Tr. 537, 1120).

[13] Plaintiff reports "headache described as throbbing, global and over the temples radiating to the occipital region, constant, no exacerbating or relieving factors, no photophobia or phonophobia, moderate in severity. He has chronic headaches which this feels similar to just more severe. Occipital injections in the past. Reports TBI as child. Denies visual changes, dizziness, balance issues. Headache started when he woke up today at 0700 also with left sided chest pain, …. (Tr. 540, 1124).

*On February 16, 2016, Plaintiff returned to the emergency department for evaluation of a headache that began that morning.* (Tr. 546, 1129).[14] *He was provided Reglan, Benadryl and Decadron to treat his headache, and discharged with a prescription of naproxen.* (Tr. 548-49, 1132).

On February 22, 2016, Plaintiff sought emergency department treatment after being hit in the right knee by a car driven by an angry relative and feeling pain in the neck, right shoulder, right hand, and left forearm. (Tr. 551, 1135).

On February 25, 2016, Plaintiff saw Dr. Gonzalez in vascular neurology. (Tr. 570, 1153).[15] Dr. Gonzalez increased gabapentin and amitriptyline. (Tr. 572, 1155).

*On February 25, 2016, Plaintiff saw Dr. Haynes-Henson, M.D., for pain management regarding his neck and headache pain. Plaintiff reported additional right arm and shoulder pain since being hit by a car two days prior.* (Tr. 565, 1148).[16] *Dr. Haynes-Henson performed repeat trigger point injections.* (Tr. 568, 1151).

---

[14] Plaintiff reports "a posterior left-sided HA which began this morning. It is severe and throbbing. It radiates to the left front of his face. It feels similar to previous HAs. He denies any recent head trauma, fever, or neck stiffness. He also reports chest pain…. He denies missing any doses of his blood pressure medicines." (Tr. 546, 1129).

[15] Plaintiff reported that "[a]fter the last appointment [on January 19, 2016] he saw Dr. Haynes-Henson. He underwent trigger point injection that helped him significantly. He was doing okay until a week ago when he had recurrence of his headaches. To make matters worse he was run over a car two days ago with knee and shoulder trauma." (Tr. 570, 1153).

[16] Plaintiff provided Dr. Haynes-Henson the following history: "[P]ain located neck and head. He received trigger point injections and occipital nerve block at their last visit. He received significant relief of symptoms and is still receiving significant relief. The patient is being treated with Naprosyn, hydrocodone used and are not beneficial. Headaches have worsened, muscle pain is improving. Severity is rated as a 10 on a scale of 0-10. Patient denies ability to perform activities of daily living. Patient reports that he was ran [*sic*] over by a car 2 days ago. Patient reports right arm and shoulder pain since this happened." (Tr. 565, 1148).

On February 25, 2016, Plaintiff saw Michelle Christo, APRN, for psychiatric medication management for his depression. (Tr. 558, 1142). The provider diagnosed PTSD and depression and prescribed prazosin. (Tr. 563-64, 1147).

On March 4, 2016, Plaintiff saw a provider concerning facial swelling as well as his headaches. (Tr. 573, 1156).[17]

*On March 12, 2016, Plaintiff sought emergency department treatment for a headache.* (Tr. 576, 1159).[18] *A Reglan, Toradol Benadryl injection was performed and he was discharged.* (Tr. 400, 1162).

On March 15, 2016, Plaintiff sought emergency room treatment for a diffuse pressure-like headache. (Tr. 404, 1166).[19] He was provided Norco and discharged. (Tr. 406-07, 1168).

*On March 15, 2016, Plaintiff followed up with Dr. Douglas Wheatley, M.D., following his morning emergency department treatment. Dr. Wheatley performed a Toradol injection.* (Tr. 408, 1170).[20]

---

[17] Plaintiff stated the headache was in the back of his head, and he'd had it since 1972 when he fell and hit his head at age 7. (Tr. 573, 1156).

[18] Plaintiff went to the ER "for evaluation of headache of 1.5 days duration. Pt states current headache is more severe than his usual headaches and different in quality. Pt is unsure of precipitating events or what he was doing when the headache began, but does endorse pain gradually increased to become severe headache he has had over the last 20 minutes. Pt reports neck stiffness. Pt endorses associated weakness and paraesthesias [*sic*] as well as photophobia. Pt denies fever, rash, SOB, confusion, chest pain. Pt has found no alleviating factors." (Tr. 576, 1159).

[19] Plaintiff presents "with a history of chronic tension and cervicogenic headaches with cervical arthritis complains over the last few days of worsening of his chronic daily headaches, complains of diffuse pressure-like headache, somewhat worse with palpation in places. Pain today is 10 out of 10 in severity, and extends into the posterior neck which is also worse with palpation.… Denies back pain, arm pain, numbness in the arms and legs, blurred vision, eye drainage, sore throat, CP, SOB, abdominal pain, nausea, photophobia or any other pain." (Tr. 404, 1166).

[20] Dr. Wheatley's presumptive diagnosis was that Plaintiff's chronic headache was made worse by a spinal tap that was performed 2 days before in the emergency

On March 18, 2016, Plaintiff reported the Toradol injection had not helped. (Tr. 409, 1171).[21] A physician assistant performed a Compazine injection and prescribed hydroxyzine. (Tr. 410, 1172).

On March 21, 2016, Plaintiff saw Dr. Haynes-Henson, who performed a left cervical medial branch injection. (Tr. 410, 1173). Dr. Haynes-Henson also referred Plaintiff to ophthalmology for his left eye pain. (Tr. 415).

On April 6, 2016, Plaintiff returned to Ms. Christo for psychiatric medication management. (Tr. 416, 1174). Ms. Christo started Risperdal and continued prazosin. (Tr. 420, 1178).

*On April 10, 2016, Plaintiff sought emergency department treatment at Nebraska Medical Center for developing vision issues due to a bump under the skin of his left eye.* (Tr. 421, 1179). *He was also provided a migraine cocktail of Reglan and Benadryl.* (Tr. 424, 1182).[22]

On April 28, 2016, Plaintiff saw Dr. James Gigantelli, M.D., concerning his proptosis and dry eyes. (Tr. 588).[23]

---

room. It was noted that 30 minutes after the Toradol injection Plaintiff's headache had improved to the point where he felt comfortable going home. (Tr. 408, 1170).

[21] Plaintiff describes "this as a pressure sensation in his head. He feels like the pain is worsening…. He notes, the pain, is a 10/10. He notes the Toradol he was given earlier this week didn't help…. He does admit the benadryl he was given in the ER did help his headache." (Tr. 409, 1171).

[22] Following the IV fluids and headache treatment, Plaintiff "still had a slight headache but was feeling improved." He was diagnosed with "other migraine with status migrainosus, not intractable." (Tr. 424, 1182).

[23] Plaintiff subsequently saw Dr. Gigantelli for his eye issues on October 26, 2016 (Tr. 1515), November 14, 2016 (Tr. 1524), February 15, 2017 Tr. 1532), June 21, 2017 (Tr. 698), and January 19, 2018 (Tr. 706).

*On April 28, 2016, Dr. Haynes-Henson performed a left cervical medial branch injection.* (Tr. 590, 1184).[24]

On May 5, 2016, Plaintiff saw Ms. Christo for psychiatric medication management. (Tr. 595, 1189). Plaintiff reported he was having trouble finishing his disability paperwork, staying in his room all the time trying to complete it. Plaintiff reported he had quit a job because it was too hard physically. (Tr. 596, 1190). Ms. Christo increased Risperdal and continued prazosin. (Tr. 600, 1194).

On May 11, 2016, Plaintiff saw Dr. Robert Hill, M.D., at the pain clinic following the cervical medial branch block injections. Plaintiff reported a little relief and his pain was still 9 out of 10. (Tr. 1195). Dr. Hill noted the headache pain could be related to pressure from the facial abscess and planned to wait for the abscess to be drained before modifying and planning further treatment. (Tr. 1198).

On June 1, 2016, Plaintiff saw Dr. Gonzalez in vascular neurology. (Tr. 617, 1204).[25] Dr. Gonzalez continued nortriptyline and stated a trial of tizanidine. (Tr. 619, 1207).

*On June 10, 2016, Plaintiff returned to Dr. Haynes-Henson reporting no relief of his pain.* (Tr. 620, 1207-08).[26] *He had been unable to obtain tizanidine.* (Tr. 620, 1208). *Dr. Haynes-Henson increased nortriptyline and performed a repeat occipital nerve block injection.* (Tr. 623, 1211).

---

[24] This injection was for treatment of Plaintiff's neck pain, as he was diagnosed with "cervicalgia, cervical spondylosis." (Tr. 590, 1184).

[25] Plaintiff reports that "he has been following with Dr. Haynes-Henson. He underwent trigger point injection that helped him significantly. He continues to have daily headache. He reports that nortriptyline helps him sleep and reduce his amount of pain he has." (Tr. 617, 1204).

[26] Plaintiff presents with "neck pain, left shoulder pain and head pain. Following the last visit he reports no relief of pain. Severity is rated as a a [*sic*] 8 on a scale of 0-10. Patient cannot perform activities of daily living." (Tr. 620, 1208).

23

On July 15, 2016, Plaintiff saw Dr. Wheatley for primary care requesting a work note. (Tr. 632, 1212).[27] Dr. Wheatley provided a note stating: "Mr. Charles E Phillip has been unable to work secondary to chronic head pain." (Tr. 630, 668).

On July 21, 2016, Plaintiff saw Dr. Haynes-Henson for pain management. (Tr. 632, 1212). He reported no relief from the occipital nerve blocks for his headache pain and significant relief for his neck pain. His neck pain was returning. Plaintiff reported near daily headaches, occurring at least 20 out of the last 30 days. (Tr. 633, 1213).[28] Dr. Haynes-Henson concluded further occipital nerve block injections were probably not going to give any longer relief, and recommended Botox injections. (Tr. 636, 1216).

On July 23, 2016, Plaintiff sought emergency department treatment for headache and chest pain. (Tr. 641, 1217).[29] He was provided a migraine cocktail and admitted due to an enlarged appendix and possible diverticulitis. (Tr. 644, 1220-21). On July 25, 2016, Plaintiff was discharged. (Tr. 650, 1227).

On August 25, 2016, Plaintiff saw Ms. Christo for psychiatric medication management. (Tr. 1229). She restarted Risperdal and continued prazosin. (Tr. 1233).

---

[27] Plaintiff states "he's been unable to complete out work schedule secondary to his pain. He is pursuing chronic disability secondary to this. With his headache he describes no aura, and complains of no nausea and vomiting when these are especially bad." He "described current head pain as like a band over the occipital area." Dr. Wheatley's assessment was "chronic muscle contraction headaches." (Tr. 632, 1212).

[28] Plaintiff also reports "nausea and vomiting associated with these headaches. Occasional photophobia, no phonophobia. Generally nauseated to the point of vomiting > 50% of headaches." (Tr. 633, 1213).

[29] Plaintiff states he "has had an ongoing migraine for the last few days.... States that the pain is the same pattern of pain on the left side of his head.... He also states that he has had feelings of fever and chills, nausea and one episode of vomiting ever since the pain began." (Tr. 641, 1217-18).

24

On September 5, 2016, Plaintiff sought emergency department treatment with various sore throat complaints that developed after his Botox injections two weeks prior. (Tr. 1234).

On September 7, 2016, Plaintiff saw Dr. Gonzalez with vascular neurology. He reported mild improvement following the Botox injection on August 22, 2016. He reported his pain was still 6 or 7 with pressure-like pain and dullness over the left eye. (Tr. 1239). Dr. Gonzalez started a trial of topiramate. (Tr. 1241).

On September 9, 2016, Plaintiff sought emergency room treatment for sore throat and right ear pain. (Tr. 1242).

On September 27, 2016, Plaintiff sought emergency department treatment for tingling in his left face and intermittent chest pain. (Tr. 1259). He was discharged on September 28, 2016. (Tr. 1265).

On October 3, 2016, Plaintiff saw Dr. Rav Mirpuri, M.D., in the pain clinic for a follow up concerning his Botox injections, and reported no relief. (Tr. 1270).[30] Dr. Mirpuri stated a trial of indomethacin and noted if it was ineffective then headaches were unlikely to be hemicrania continua. Dr. Mirpuri continued Topamax and cautioned against daily use of Maxalt. (Tr. 1275).

On October 10, 2016, Plaintiff saw Dr. Haynes-Henson and reported he had to stop indomethacin due to chest pain and was having a daily headache. (Tr. 1276). Dr. Haynes-Henson discussed an ENT referral due to sinus issues on his CT of his head and set up the referral. (Tr. 1279).

---

[30] Plaintiff "reports having mostly left side headache pain that he describes as throbbing. Reports occasional sonophobia and phototphobia but not severe. States he went to ER 2 days ago because of his headaches and chest pain…. Headache severity is rated as a constant 6-9 on a scale of 0-10. Patient is unable to perform activities of daily living." (Tr. 1270).

25

On October 27, 2016, Plaintiff saw Dr. Samuel Pate, M.D., in otolaryngology. (Tr. 1279). Dr. Pate concluded he did not think Plaintiff's sinuses were related to his headaches and planned a septoplasty. (Tr. 1285).

*On October 31, 2016, Plaintiff returned to Dr. Haynes-Henson. Plaintiff reported Topamax was not helping with his headaches.* (Tr. 1285).[31] *Dr. Haynes-Henson restarted nortriptyline and topiramate and performed repeat trigger point injections in the posterior and neck and trapezius muscles.* (Tr. 1289-90).

On November 21, 2016, Mr. Philip saw Dr. Wheatley for primary care. He reported he had syncopal event and passed out on the floor a month prior. (Tr. 1290).

On December 12, 2016, Dr. Pate performed a septoplasty. (Tr. 1292).

On January 3, 2017, Plaintiff saw Dr. Gonzalez in vascular neurology. (Tr. 1314). Dr. Gonzalez started a trial of baclofen. (Tr. 1316).

On January 4, 2017, Plaintiff saw Ms. Christo for psychiatric medication management. (Tr. 1317). She continued prazosin. (Tr. 1322).

On January 4, 2017, Plaintiff saw Dr. Haynes-Henson for pain management. (Tr. 1323). He reported about 85 percent relief from the last trigger point injections and repeated another round because his symptoms had worsened back to 7 out of 10. Dr. Haynes-Henson repeated the trigger point injections. (Tr. 1326-27).

On January 17, 2017, Plaintiff sought emergency room treatment for chest pain and left arm pain. (Tr. 1328). Plaintiff was discharged on January 18, 2017 with an atypical chest pain diagnosis. (Tr. 1341-42).

*On January 23, 2017, Plaintiff saw Dr. Haynes-Henson and reported moderate relief for three weeks on the left side following the last round of trigger*

---

[31] Plaintiff "continues to rate the severity of his headaches as a 8 on a scale of 0-10. The headaches are constant with some waxing and waning. He gets dizzy when his headache is coming on." (Tr. 1285).

*point injections and also reported daily headaches.* (Tr. 1344).[32] *Dr. Haynes-Henson performed repeat trigger point injections on the opposite side and planned to obtain authorization again for Botox injections.* (Tr. 1347-48).

On February 2, 2017, Plaintiff returned to Dr. Haynes-Henson for a Botox injection, rating his pain at 8 out of 10. (Tr. 1349-53).

On March 2, 2017, Plaintiff returned to Dr. Haynes-Henson and reported 60 percent improvement with his headaches following the Botox injections. (Tr. 710). Dr. Haynes-Henson planned a repeat Botox injection in two months and performed trigger point injections. (Tr. 714-15).[33]

On March 8, 2017, Plaintiff saw Ms. Christo for psychiatric medication management. (Tr. 716). Ms. Christo restarted Risperdal and continued prazosin. (Tr. 721).

On March 28, 2017, Plaintiff saw Dr. Wheatley for primary care, discussing right foot pain and left arm bruising. (Tr. 721-22).

On April 11, and April 14, 2017, Plaintiff sought emergency department treatment for sore throat and muscle ache issues. (Tr. 723, 727).

On May 1, 2017, Plaintiff sought emergency department treatment for chest pain. (Tr. 733). On May 2, 2017, Plaintiff was discharged with a diagnosis of atypical chest pain. (Tr. 750).

---

[32] Plaintiff reports "[h]aving pain on the right neck/back and wants injections today." He also reports having headaches "every day with no breaks. He describes them as bilateral on the side and back of the head. He has light and sound sensitivity with these headaches. He has significant nausea and some vomiting when the headaches are severe." (Tr. 1344).

[33] Dr. Haynes-Henson's assessment was "chronic migraine that is intractable" and "cervical and trapezius myofascial pain." (Tr. 714).

On May 25, 2017, Plaintiff sought emergency treatment for chest pain and cough symptoms. (Tr. 752).

On May 31, 2017, Plaintiff saw Patricia Cooper, APRN, in cardiology for evaluation of his headaches and right arm pain, as well as his nonradiating chest pain. (Tr. 759). Ms. Cooper planned for an evaluation in 1-2 months with the cardiologist with an echocardiogram and cardiac event recorder. (Tr. 763).

On June 1, 2017, Plaintiff saw Dr. Haynes-Henson and she performed cervical paraspinal trigger point injections. (Tr. 764-68).[34]

On July 20, 2017, Plaintiff saw Dr. Haynes-Henson and reported that following Botox injections he was pain free for 9 weeks and trigger point injections were helpful for his neck pain. (Tr. 770).[35] Dr. Haynes-Henson performed a repeat Botox injection. (Tr. 774).

---

[34] Plaintiff reports "significant relief of pain" since his last botox injection on April 27, 2017. "He reports that he is still having 1 headache per day (30 per month) than can range from 2-20 hrs (improved with botox to 4 hour duration on most days), however, the intensity and severity has significantly improved by 90% compared to his baseline. Severity still can spike to 7 on a scale of 0-10. He reports occasional photophobia. Patient cannot perform activities of daily living when the headaches occur…. Patient does not employ strategies of meditation, yoga, distraction, and engaging in activities to decrease pain thoughts and symptoms. Additionally patient reports neck pain that has been relieved with trigger point injections in past." (Tr. 764).

[35] "Following the last visit [Plaintiff] reports 85% relief of pain, lasting 4 weeks. Prior to Botox injections patient had daily headaches, with a pain score of 8/10 per day. Following Botox injections, patient states he was pain-free for 9 of the 12 weeks. He noted that he either had 0-2 out of 10 pain or no headache at all during this. The effects of his injection wore off approximately 3 weeks ago and returned as a headache with severity rated as a a [sic] 8 on a scale of 0-10. He describes his headache as a stabbing pain in the center of his forehead radiating down to the back of his neck. He denies aura. He has photophobia. He does not currently take any medications to help with pain relief or migraine prevention. Patient states the pain interferes with him performing his activities of daily living. Pt denies side effects

On August 1, 2017, Plaintiff saw Dr. Wheatley for primary care and to complete disability forms for Douglas County. (Tr. 775).[36] Dr. Wheatley completed the form, noting he expected Plaintiff to be disabled for life due to PTSD and chronic headaches related to head trauma as a child. (Tr. 680).

On August 3, 2017, Plaintiff followed with cardiology and cardiology concluded the chest pain was likely not cardiac. (Tr. 776).

On August 21, 2017, Plaintiff saw Dr. Ryan Birkland, D.O., in the pain clinic, reporting five headaches per month with Botox treatment. He reported his neck and shoulder pain had returned and were 10 out of 10. (Tr. 777).[37] Dr. Birkland performed trigger point injections. (Tr. 780).

On October 6, 2017, Plaintiff saw Ms. Christo for psychiatric medication management. (Tr. 781). Ms. Christo decreased Risperdal and continued prazosin. (Tr. 785).

On October 12, 2107, Plaintiff saw Dr. Haynes-Henson for a Botox injection. (Tr. 786-87).

On November 22, 2017, a provider in the pain clinic performed trigger point injections for his neck and shoulder pain. (Tr. 787-91).

On November 24, 2017, Plaintiff saw Ms. Christo for psychiatric medication management. (Tr. 791). Ms. Christo continued Risperdal and prazosin. (Tr. 796).

---

from botox. Also noted that his trigger point injections from his previous visit were very helpful in relieving his neck pain." (Tr. 770).

[36] Dr. Wheatley's assessment was post-traumatic stress disorder" and "chronic intractable headache, unspecified headache type." (Tr. 775).

[37] Plaintiff reports 95% relief since last Botox injection 4 weeks ago. "Patient reports headaches are less severe, less frequent, and reports being more functional with fewer trips to the emergency room and missing less days of work." (Tr. 777).

On December 13, 2017, a provider at the pain clinic performed additional trigger point injections. (Tr. 797-801).

On December 13, 2017, Plaintiff saw a provider concerning enlarged lymph nodes. (Tr. 801).

On January 4, 2018, Plaintiff received Botox injections at the pain clinic. (Tr. 804).[38]

On January 18, 2018, Plaintiff sought emergency room treatment for upper respiratory injection symptoms. (Tr. 805).

## STANDARD OF REVIEW

When reviewing a Social Security disability benefits decision, the district court does not act as a fact-finder or substitute its judgment for the judgment of the ALJ or the Commissioner. *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995). Rather, the district court's review is limited to an inquiry into whether there is substantial evidence on the record to support the findings of the ALJ and whether the ALJ applied the correct legal standards. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). Substantial evidence is "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229).

However, this "review is more than a search of the record for evidence supporting the [ALJ or Commissioner's] findings," and "requires a scrutinizing analysis." *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008). In determining whether there is substantial evidence to support the Commissioner's decision, this court must consider evidence that detracts from the Commissioner's

---

[38] "With the treatment of Botox patient has 8 headaches per month… Patient states headaches are less severe." (Tr. 804).

decision as well as evidence that supports it. *Finch v. Astrue,* 547 F.3d 933, 935 (8th Cir. 2008). If, after reviewing the record, the Court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. *Perkins*, 648 F.3d at 897.

## DISCUSSION

### The ALJ's Step-Three Determination

Plaintiff contends the ALJ erred at step three of the sequential evaluation process because he failed to make a specific finding that Plaintiff's headaches are not medically equivalent to listing 11.02 (epilepsy). In particular, Plaintiff argues the ALJ should have evaluated whether the listing was equaled "before Botox injections started providing some relief in March of 2017." (Filing 17 at 23).

"Primary headache disorder is not a listed impairment in the Listing of Impairments (listings); however, [the SSA] may find that a primary headache disorder, alone or in combination with another impairment(s), medically equals a listing." *Titles II and XVI: Evaluating Cases Involving Primary Headache Disorder*, Social Security Ruling ("SSR") 19-4p, 2019 WL 4169635, at *7 (S.S.A. Aug. 26, 2019) (footnotes omitted).[39] "Epilepsy (listing 11.02) is the most closely analogous listed impairment for an MDI [medically determinable impairment] of a primary headache disorder. While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and [the SSA] may find that his or her MDI(s) medically equals the listing." *Id.* Listing 11.02 provides in relevant part:

11.02 Epilepsy, documented by a detailed description of a typical seizure and characterized by A, B, C, or D:

_____

[39] "Primary headache disorders are among the most common disorders of the nervous system. Examples of these disorders include migraine headaches, tension-type headaches, and cluster headaches." SSR 19-4p, 2019 WL 4169635, at *2. "Primary headaches occur independently and are not caused by another medical condition." *Id.*, at *3.

A. [not applicable]; or
B. Dyscognitive seizures (see 11.00H1b), occurring at least once a
   week for at least 3 consecutive months (see 11.00H4) despite
   adherence to prescribed treatment (see 11.00C); or
C. [not applicable]; or
D. Dyscognitive seizures (see 11.00H1b), occurring at least once
   every 2 weeks for at least 3 consecutive months (see 11.00H4)
   despite adherence to prescribed treatment (see 11.00C); and a
   marked limitation in one of the following:
   1. Physical functioning (see 11.00G3a); or
   2. Understanding, remembering, or applying information
      (see 11.00G3b(i)); or
   3. Interacting with others (see 11.00G3b(ii)); or
   4. Concentrating, persisting, or maintaining pace (see
      11.00G3b(iii)); or
   5. Adapting or managing oneself (see 11.00G3b(iv)).

20 C.F.R. pt. 404, subpt. P, app. 1, § 11.02 (effective Sept. 29, 2016).[40] Dyscognitive
seizures are characterized by alteration of consciousness without convulsions or loss
of muscle control. *Id.*, § 11.00H1b.

SSR 19-4p provides specific guidance on how to evaluate headaches for
equivalency to listing 11.02,[41] and, had it been in existence, should have been used

---

[40] This is version of listing 11.02 that was in effect at the time of the ALJ's
decision. *See Revised Medical Criteria for Evaluating Neurological Disorders*, 81
Fed. Reg. 43,048, 2016 WL 3551949 (July 1, 2016). The SSA explained that it
would apply the revised listings "to new applications filed on or after [September
29, 2016] and to claims that are pending on or after [that] effective date," and that it
"expect[ed] that Federal courts will review the Commissioner's final decisions using
the [listings] that were in effect at the time [the Commissioner] issued the decisions."
*Id.* at 43051 & n. 6.

[41] "To evaluate whether a primary headache disorder is equal in severity and
duration to the criteria in 11.02B [for dyscognitive seizures occurring at least once a
week for at least 3 consecutive months], [the SSA] consider[s]: A detailed
description from an AMS [acceptable medical source] of a typical headache event,
including all associated phenomena (for example, premonitory symptoms, aura,
duration, intensity, and accompanying symptoms); the frequency of headache

by the ALJ in making his step-3 determination. "Although SSRs do not have the same force and effect as statutes or regulations, they are binding on all of [the SSA's] components in accordance with 20 CFR 402.35(b)(1) and are binding as precedents in adjudicating cases." SSR 19-4p, 2019 WL 4169635, at *1. However, SSR 19-4p did not become applicable until August 26, 2019, which was about one year after the ALJ's decision was issued, and four months after the Appeals Council's denial of Plaintiff's request for review of the ALJ's decision. *See* SSR 19-4p, 2019 WL 4169635, at *6. In issuing SSR 19-4p, the Social Security Administration stated:

> We will use this SSR beginning on its applicable date. We will apply this SSR to new applications filed on or after the applicable date of the SSR and to claims that are pending on and after the applicable date. This means that we will use this SSR on and after its applicable date in any case in which we make a determination or decision. *We expect that Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions.* If a court reverses our final decision and remands a case for further administrative proceedings after the applicable date of this SSR, we will apply this SSR to the entire period at issue in the decision we make after the court's remand.

---

events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations)." SSR 19-4p, 2019 WL 4169635, at *7. "To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02D [for dyscognitive seizures occurring at least once every 2 weeks for at least 3 consecutive months], [the SSA] consider[s] the same factors [it] consider[s] for 11.02B and [it] also consider[s] whether the overall effects of the primary headache disorder on functioning results in marked limitation in: Physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself." *Id.*

33

*Id.*, n. 27 (emphasis supplied).[42] Despite this clear statement by the SSA that it would not apply SSR 19-4p retroactively, and did not expect federal courts to apply the rule retroactively, both parties rely upon SSR 19-4p in making their arguments. (*See* Filing 17 at 23-26; Filing 20 at 5-7).

A further complication is that fact that the current version of listing 11.02 did not go into effect until six months after Plaintiff filed his application for benefits. Before then, listing 11.02 pertained strictly to convulsive seizures. Nonconvulsive seizures were the subject of listing 11.03,[43] which is now "reserved" for future use. Effective September 29, 2016, the SSA revised the listings criteria for neurological disorders, and merged listing 11.03, with significant modifications, into the revised listing 11.02. There was no Social Security Ruling that equated headaches to former 11.03, although the SSA's Program Operations Manual System ("POMS")[44] DI 24505.015 provided an example in which listing 11.03 was identified as being

---

[42] "Generally, if an agency makes a policy change during the pendency of a claimant's appeal, the reviewing court should remand for the agency to determine whether the new policy affects its prior decision." *Sloan v. Astrue*, 499 F.3d 883, 889 (8th Cir. 2007) (quoting *Ingram v. Barnhart,* 303 F.3d 890, 893 (8th Cir. 2002)). Here, however, the SSA has already determined that SSR 19-4p does not affect a decision made prior to its applicable date.

[43] Listing 11.03 provided: "Epilepsy—nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day." 20 C.F.R. part 404, subpt. P, App. 1, § 11.03 (rescinded effective Sept. 29, 2016). *See Mann v. Colvin*, 100 F. Supp. 3d 710, 718 (N.D. Iowa 2015).

[44] "Although POMS guidelines do not have legal force, and do not bind the Commissioner, [the Eighth Circuit] has instructed that an ALJ should consider the POMS guidelines." *Shontos v. Barnhart*, 328 F.3d 418, 424 (8th Cir. 2003); *see also Rodysill v. Colvin*, 745 F.3d 947, 950 (8th Cir. 2014) ("As an interpretation of a regulation promulgated by the Commissioner, the POMS control unless they are inconsistent with the regulation or plainly erroneous.").

closely analogous to chronic migraine headaches.[45] That guideline, however, was superseded on February 13, 2018, by POMS DI 24508.010,[46] which no longer includes that example. *See Owens v. Saul*, No. 118CV03013TLWSVH, 2019 WL 7900070, at *12 (D.S.C. Oct. 10, 2019), *report and recommendation adopted*, No. 1:18-CV-03013-TLW, 2020 WL 635798 (D.S.C. Feb. 11, 2020). A 2009 policy statement, the Social Security Administration's National Q&A 09-036 ("SSA Q&A 09-036"), which was intended to provide guidance while proposed updates to the neurological listings (eventually implemented in 2016) were being prepared, also identified former listing 11.03 as the most analogous listing for migraines.[47] *See Hill v. Berryhill*, No. CV 6:17-3198-BHH-KFM, 2019 WL 2125453, at *16 & n. 6

---

[45] POMS DI 24505.015(B)(7)(b) gave the following example: "A claimant has chronic migraine headaches for which she sees her treating doctor on a regular basis. Her symptoms include aura, alteration of awareness, and intense headache with throbbing and severe pain. She has nausea and photophobia and must lie down in a dark and quiet room for relief. Her headaches last anywhere from 4 to 72 hours and occur at least 2 times or more weekly. Due to all of her symptoms, she has difficulty performing her ADLs [activities of daily living]. The claimant takes medication as her doctor prescribes. The findings of the claimant's impairment are very similar to those of 11.03, Epilepsy, non-convulsive. Therefore, 11.03 is the most closely analogous listed impairment. Her findings are at least of equal medical significance as those of the most closely analogous listed impairment. Therefore, the claimant's impairment medically equals listing 11.03." *See Mann*, 100 F. Supp. 3d at 719 (ALJ's error in failing to consider listed impairment for nonconvulsive epilepsy was not harmless; remand was required with directions that ALJ consider whether claimant's chronic migraine headaches met or equaled listing 11.03).

[46] Available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0424508010.

[47] "Among other things, the SSA noted that the requirement of occurrence 'in spite of at least 3 months of prescribed treatment' was inapplicable to migraines because 'unlike treatment for epilepsy, which seeks to maintain a steady level of medication in the blood, there is no such standard of care in the treatment of migraine headaches.' In addition, 'it is not necessary for a person with migraine headaches to have alteration of awareness as long as s/he has an effect ... that significantly interferes with activity during the day.' 'Significant interference with activity during the day' has the '[s]ame meaning as in listing 11.03' and '[m]ay be the result, e.g., of a need for a darkened, quiet room, lying down without moving, or a sleep disturbance that impacts on daytime activities.'" *Grancea*, 2019 WL 4393371, at *4 (quoting *Worley*, 2019 WL 1272540, at *4).

(D.S.C. Jan. 14, 2019), *report and recommendation adopted in part, rejected in part*, No. CV 6:17-3198-BHH, 2019 WL 1232634 (D.S.C. Mar. 18, 2019).

The disability examiner who made the initial determination on July 5, 2016, that Plaintiff was not disabled, specifically noted that he did not have a diagnosis of migraine headaches or any associated symptoms.[48] Her analysis of the medical records concerning Plaintiff's claimed physical impairments was as follows:

> 50 year old male alleging brain injury, severe headaches, high blood pressure, severe arthritis in neck and shoulder, torn rotator cuff, Arthritis in right thumb, lasting effects of broken toe, bumps underneath right eye, high cholesterol. AOD: 4/1/14, POD: 12/31/13 and Filing date: 3/31/16. Adl's [activities of daily living] report that claimant has a hard time using the toilet, his legs go numb and he has a hard time standing afterwards. He reports not being able to stand or walk for long periods of time. ALJ denial [of previous claim]: 10/9/2015 to light work. Claimant has called in multiple times and speaks with a lisp. 3/12/16: CT of the head: claimant diagnosed with chronic tension headache, chronic neck pain and depression.
>
> 3/15/16: ER visit for Neck pain and headaches. He has a diagnosis of cervical arthritis and has undergone injections.
>
> Records from UNMC Vascular Neurology report that claimant['s] headaches started in the second grade as a consequence of a head trauma. His headaches have been more or less the same, but frequency and intensity has increased over the last two years. He has undergone multiple injections with minimal relief. A CT scan shows: proptosis and excess periorbital fat. 5/24/16 ER visit due to pain of this mass. He complains of dizziness and more fatigue.
>
> 6/1/16: FU [follow-up] for neck, left shoulder and head pain. Severity of pain is 8/10.

---

[48] A medical equivalency determination made pursuant to SSR 19-4p is not limited to migraines. Any "primary headache" condition (i.e., one not caused by another medical condition) can qualify.

36

6/10/16: claimant underwent bilateral greater and lesser occipital nerve blocks.

Overall Evidence concludes that this is a tough case to determine what is exactly going on. Claimant does not have a migraine diagnosis and really has no other symptoms other than pain. No Aura, etc. There are no gait abnormalities or findings suggestive of this. Adl's report the inability to stand or walk, but there are no objective findings supporting this allegation. His headaches are his main concern, but not deemed marked or listing level. Claimant appears capable of work as outlined in this RFC.

(Tr. 94-95; 110-11). The only listings considered were 1.04 (spine disorders), 12.04 (affective disorders), and 12.06 (anxiety disorders). (Tr. 96, 112).

The initial RFC was affirmed upon reconsideration on September 21, 2016, with the second disability examiner simply stating that listing 11.03 was "considered but not equaled." She summarized her findings as follows:

Summary: The claimant has severe MDI of tension headaches and myofascial pain syndromes. The myofascial syndrome responds well to trigger point injections and will not cause exertional limits. These will result in environmental and postural restrictions as per RFC. Listing 11.03 is considered but not equaled. This is not a change from the initial RFC - initial RFC affirmed. NHImd09/20/16[49]

(Tr. 131; 150). Her review of Plaintiff's medical records including the following observations:

Claimant has been seen for chronic tension headaches, first appointment on 8/13/15. At that time complained of face swelling, no face swelling on exam. On 8/27/15 given ultram and toradol for headache. Noted on 9/4/15 that head CT from 2014 was negative. Claimant begins treatment with neurologist on 11/5/15, failed F/U in 12/15 but returned in 1/19/16, 2/25/16,6/2/16. At all appointments with

---

[49] This is a reference to the RFC determination made by the state agency consulting physician, Nancy H. Ingram, M.D. (Tr. 135, 154).

neurologist claimant states headaches are not accompanied by nausea, vomiting, photophobia or phonophobia. On all physical exams by neurologist claimant exhibits normal muscle bulk and tone, strength 5/5 in all extremities, normal station and gait, normal DTRs. Cranial nerves are all intact. Head CT from 8/3/15 showed no hemorrhage, mass midline shift or hydrocephalus. At all appointments neurologist makes diagnosis of chronic tension type headache. Claimant has been treated with gabapentin and nortriptyline. On 6/2/16 claimant tells neurologist that trigger point injections have helped neck pain, and headache pain decreased with nortriptyline. Claimant is also follow[ed] by pain clinic -on 1/7/16 pain clinic makes diagnosis of myofascial pain syndrome, has treated claimant with occipital blocks and trigger point injections on 1/27/16, trigger point injections again on 2/2/16, cervical branch block on 3/21/16- with significant relief of pain from that block. Occipital block is repeated on 6/10/16. Note is made in the pain clinic that moving head does NOT produce pain symptoms. There is note of a xray of cervical spine in 7/29/15 that showed early degenerative disease at C4-C5, and C5-C6, with normal vertebral height and alignment. Neurosurgeon references cervical MRI in 1/20/16 that showed minimal formainal stenosis of the C spines. Claimant attends physical therapy for muscle tension headaches from 12/2015 until 2/10/2016. Claimant continues to complain to PT of pain with motion of neck. However, on 2/10/16 claimant brings his toddler daughter to the PT appointment, and physical therapist notes that claimant has full range of movement and use of head, neck and arms with no observable discomfort while attending to child. Also, physical therapist states that claimant has found his occipital protuberance and he needs to stop rubbing it. Claimant is discharged from physical therapy, again therapist states full function without observable pain.

There are five documented trips to the ER from 1/20/14 - 7/23/2016 where headache is included in chief complaint. On 1/20/14 admitted for atypical chest pain and sinusitis; on 12/8/2015 for headache and chest pain (more concern is made to chest pain); on 2/8/16 for headache, when another CT scan showed no mass effect and no acute hemorrhage, claimant improved with IV fluids, Benadryl and reglan; 2/14/16; 3/12/16 (with CT scan mentioned in initial), and 7/23/16 when claimant had diarrhea and abdominal pain. Emergency room trips for headaches have been occasional.

Claimant's headaches are not migraine in nature (no nausea, vomiting, photophobia, or phonophobia).

(Tr. 131; 148-49).

The Commissioner states that "[t]he ALJ specifically noted Plaintiff denied having symptoms that showed the severity of his headaches did not equal a listing," and generally cites to pages 26-28 of the transcript, in which the ALJ discusses Plaintiff's headaches in connection with his RFC determination. (Filing 20 at 5). The Commissioner presumably is making reference to the ALJ's single statement that Plaintiff "denied any nausea, vomiting, phonophobia, and photophobia associated with his headaches" when he saw Dr. Jones on September 14, 2015 (Tr. 464, 1040), and Dr. Gonzalez on November 5, 2015 (Tr. 473, 1049). It was the impression of both physicians that Plaintiff suffered from chronic tension-type headaches.

The Commissioner also states that "[t]he agency medical consultants stated, 'Listing [11.02] is considered but not equaled' and 'His headaches are his main concern, but not deemed marked or listing level (Filing 9-3, Tr. 95, 111, 131, 150)." (Filing 20 at 5). Technically speaking, this is incorrect, because these statements are contained in the Findings of Facts and Analysis of Evidence ("FOFAE") section of the Disability Determination Explanation forms, which were prepared by disability examiners, as evidenced by their initials at the end of the section. The state agency medical consultants merely reference the FOFAEs in making their assessments of Plaintiff's "Medically Determinable Impairments and Severity" and his "Residual Functional Capacity." (*See* Tr. 96-100, 112-116, 132-138, 151-157).[50] However, the state agency consulting physician's electronic signature appears at the end of each form, along with that of the disability examiner. (Tr. 103, 119, 140, 159).

Significantly, the listing that was considered by the disability examiner upon reconsideration was listing 11.03 (Tr. 131, 150), which was in effect at the time, and

---

[50] No medical evaluation was made, either as part of the initial review or upon reconsideration. (*See* Tr. 95, 111, 131, 150, stating: "No 416-Medical Evaluation have been associated with this claim.").

not the version of listing 11.02 that was in effect when the ALJ issued his decision. Although the listings are similar, they are not the same. *See Hill*, 2019 WL 1232634, at *4 (remanding for further step-3 analysis based on revised listing 11.02 instead of former listing 11.03).

The most recent medical record the second disability examiner reviewed apparently was the July 23, 2016 visit to the ER, when Plaintiff complained of chest pains and an ongoing headache, with nausea and vomiting, for which he was provided a "migraine cocktail." (Tr. 1217-21). Two days earlier, Plaintiff had also complained to Dr. Haynes-Henson that he was experiencing near daily headaches, with associated nausea and vomiting, and occasional photophobia; the doctor recommended Botox injections. Plaintiff was also given a "migraine cocktail" in the ER on April 10, 2016, and was diagnosed with "other migraine with status migrainosus, not intractable." (Tr. 1182). No mention is given to these entries in the disability examiner's FOFAE. Subsequent medical records contain many more references to migraine symptoms, and on March 2, 2017, Dr. Haynes-Henson diagnosed Plaintiff with "chronic migraine that is intractable." (Tr. 714).

The Eighth Circuit "has consistently held that a deficiency in opinion-writing is not a sufficient reason for setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case." *Vance v. Berryhill*, 860 F.3d 1114, 1118 (8th Cir. 2017) (quoting *Senne v. Apfel*, 198 F.3d 1065, 1067 (8th Cir. 1999)). "An ALJ's failure to address a specific listing or to elaborate on his conclusion that a claimant's impairments do not meet the listings is not reversible error if the record supports the conclusion." *Id.* (citing *Karlix v. Barnhart*, 457 F.3d 742, 746 (8th Cir. 2006); *Pepper ex rel. Gardner v. Barnhart*, 342 F.3d 853, 855 (8th Cir. 2003)). Likewise, "[t]here is no error when an ALJ fails to explain why an impairment does not equal one of the listed impairments as long as the overall conclusion is supported by the record." *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011). Remand is warranted, however, "where the ALJ's factual findings, considered in light of the record as a whole, are insufficient to permit this Court to conclude that substantial evidence supports the Commissioner's decision." *Vance*, 860 F.3d at 1118 (quoting *Senne*, 198 F.3d at 1067). In *Scott*, for example, the Eighth Circuit reversed the district court's affirmance of the Commissioner's no-disability

40

decision, and remanded the case with directions that on remand the ALJ should specifically address whether the impairments of the claimant's minor son, Absalom, met or medically equaled listing 112.05D for mental retardation. The Court of Appeals stated:

> In determining that Absalom's impairment did not meet or medically equal a listed impairment, the ALJ never referred to listing 112.05D. Indeed, the ALJ did not cite or reference any listing. As a general rule, we have held that an ALJ's failure to adequately explain his factual findings is "not a sufficient reason for setting aside an administrative finding" where the record supports the overall determination. *Senne v. Apfel,* 198 F.3d 1065, 1067 (8th Cir.1999); *see also Pepper v. Barnhart,* 342 F.3d 853, 855 (8th Cir.2003); *Briggs v. Callahan,* 139 F.3d 606, 607 (8th Cir.1998). However, we have held that a remand is appropriate where the ALJ's factual findings, considered in light of the record as a whole, are insufficient to permit this Court to conclude that substantial evidence supports the Commissioner's decision. *See Chunn v. Barnhart,* 397 F.3d 667, 672 (8th Cir.2005) (remanding because the ALJ's factual findings were insufficient for meaningful appellate review); *Pettit v. Apfel,* 218 F.3d 901, 903-04 (8th Cir.2000) (same).

> In *Chunn,* for example, we reversed the district court and remanded the case for further proceedings because the ALJ's analysis was insufficient to permit adequate judicial review of the Commissioner's decision. 397 F.3d at 672. There, the applicant claimed that she was disabled due to mental retardation. *Id.* at 671. In finding that the applicant's impairment did not meet the listing for mental retardation, the ALJ failed to address the only evidence in the record evaluating the claimant's IQ—evidence which indicated that the claimant met the listing for mental retardation. *Id.* at 672. In addition, the ALJ failed to reference the listing for mental retardation or otherwise indicate that he considered the listing relevant to the disability claim. *Id.* at 671. In light of the ALJ's failure to adequately support his findings at step three, we could not determine whether substantial evidence supported the finding that the claimant did not meet or medically equal the listing. *Id.* at 672. Therefore, we remanded the case for further proceedings. *Id.*

The same is true here. Because the ALJ failed to support his finding that Absalom did not meet or medically equal the severity of a listed impairment, and because the record contains inconsistencies on this issue, we are unable to determine whether substantial evidence supports the ALJ's finding that Absalom's impairments did not meet or medically equal listing 112.05D. Nothing in the ALJ's decision indicates that the ALJ considered listing 112.05D relevant to Scott's claim. The ALJ's cursory discussion on this issue only states that in reaching the conclusion that Absalom's impairments did not meet any listing, the ALJ considered "State agency medical consultants who evaluated this issue at the initial and reconsideration levels of the administrative review process and reached the same conclusion." The ALJ, however, does not cite or reference what reports in the record he relied upon. Moreover, the evidence in the record regarding Absalom's intellectual functioning, adaptive functioning, and IQ, contains several contradictory conclusions which the ALJ failed to resolve, let alone address.

529 F.3d at 822-23.

"The administrative law judge … is responsible for deciding the ultimate legal question whether a listing is met or equaled. As trier of the facts, an administrative law judge … is not bound by a finding by a State agency medical or psychological consultant or other program physician or psychologist as to whether an individual's impairment(s) is equivalent in severity to any impairment in the Listing of Impairments. However, longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight." *Titles II & XVI: Consideration of Admin. Findings of Fact by State Agency Med. & Psychological Consultants & Other Program Physicians & Psychologists at the Admin. Law Judge & Appeals Council*, SSR 96-6p, 1996 WL 374180 (S.S.A. July 2, 1996).[51]

---

[51] SSR 96-6p was rescinded and replaced by SSR 17-2p effective March 27, 2017. However, the HALLEX directs that "[f]or claim(s) filed before March 27, 2017, adjudicators must use the prior rules throughout the entire appeals process."

"The signature of a State agency medical or psychological consultant on an SSA-831-U5 (Disability Determination and Transmittal Form) … ensures that consideration by a physician (or psychologist) designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review.[52] Other documents, including the Psychiatric Review Technique Form and various other documents on which medical and psychological consultants may record their findings, may also ensure that this opinion has been obtained at the first two levels of administrative review." *Id.*, at *3.

"When an administrative law judge … finds that an individual's impairment(s) is not equivalent in severity to any listing, the requirement to receive expert opinion evidence into the record may be satisfied by any of the foregoing documents signed by a State agency medical or psychological consultant. However, an administrative law judge … must obtain an updated medical opinion from a medical expert …. (1) When no additional medical evidence is received, but in the opinion of the administrative law judge … the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or (2) When additional medical evidence is received that in the opinion of the administrative law judge … may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." *Id.*, at *3-4. "When an updated medical judgment as to medical equivalence is required at the administrative law judge level in either of the circumstances above, the administrative law judge must call on a medical expert." *Id.*, at 4.

---

HALLEX I–5–3–30, 2017 WL 1362776, at *5. *See Atchley v. Berryhill*, No. CIV. 15-5081-JLV, 2018 WL 1135457, at *5-6 (D.S.D. Feb. 28, 2018) (finding SSR 96-6p applied to claim filed before effective date of SSR 17-2p, even though ALJ's hearing occurred after the effective date).

[52] In this case, the Disability Determination and Transmittal forms are not physically signed, but they do reference the electronic signature of the state agency consulting physician that appears at the end of each Disability Determination Explanation ("DDE") form. (Tr. 86, 87, 120, 121).

While the Disability Determination Explanation at the reconsideration level in this case indicates at least some consideration was given to former listing 11.03, there is no explanation as to why that listing was "not equaled." (Tr. 131; 150). The disability examiner's summary of the medical evidence also omits significant entries regarding Plaintiff's headaches. The ALJ's decision provides no indication that listing 11.02 was ever considered. Additional medical records were received before the ALJ's hearing, but the ALJ only cites entries which show Plaintiff's headaches abated after he started receiving Botox injections in February 2017, a fact which Plaintiff does not contest. Entries made before that date arguably would support a finding of medical equivalence to listing 11.02.

The court recognizes that SSR 96-6p did not require the ALJ to obtain an updated medical judgment as to medical equivalence unless, in his opinion, there was evidence to suggest that a judgment of equivalence might be reasonable, or that the state agency medical consultant's opinion might be changed by the additional medical evidence. However, it cannot be determined from the ALJ's decision that he gave any thought to obtaining an updated medical judgment. In fact, he does not even allude to the perfunctory determination made at the reconsideration level, that former listing 11.03 was "not equaled." Several courts have found that a breach of the duty to elicit fully informed expert testimony on equivalence warrants remand. *See Reynolds v. Colvin*, No. 3:13CV1354, 2015 WL 333064, at *11 (N.D. Ind. Jan. 23, 2015) (citing cases). *See also Owens*, 2019 WL 7900070, at *11-14 ("The court acknowledges that pursuant to SSR 17-2p, an ALJ is not required to seek an opinion from an ME if she believes the evidence does not reasonably support a finding that the claimant's impairment medically equals a listing. However, the ALJ's belief that the evidence did not reasonably support the listing was not sustained by substantial evidence ….").

There are also numerous decisions which hold that an ALJ's failure to make a specific finding as to medical equivalence between a claimant's chronic headaches and listing 11.02 is reversible error, requiring a remand. *See, e.g., Fortner v. Saul*, No. CV 9:19-0076-RMG-BM, 2020 WL 532969, at *3-4 (D.S.C. Jan. 15, 2020) ("[T]he fact that the ALJ failed to even address whether Plaintiff's migraine impairment was equivalent to Listing 11.02 could arguably be deemed sufficient to

44

warrant a remand for this purpose. Concededly, where an ALJ fails to do so (as is the case here), the decision can still be upheld as long as the overall conclusion is supported by the record. However, the undersigned is unable to determine based on the analysis set forth by the ALJ in her decision whether such a conclusion is supportable in this case, as the necessary findings were not made.") (citations omitted), *report and recommendation adopted*, No. CV 9:19-76-RMG, 2020 WL 528174 (D.S.C. Feb. 3, 2020); *Willis v. Comm'r of Soc. Sec. Admin.*, No. 2:19-CV-11689, 2020 WL 1934932, at *4-5 (E.D. Mich. Apr. 22, 2020) ("Yet, even if the Commissioner is correct that, under SSR 17-2p, the ALJ was not required to specifically articulate the bases for his conclusion that Listing 11.02 was not medically equaled, where, as here, the ALJ did not discuss the listing in question, the Court must determine whether the record evidence raises a substantial question as to Claimant's ability to satisfy each requirement of the listing. If a substantial question is raised, then it cannot be harmless error since the claimant could have been found disabled.") (internal quotations, alterations, and citations omitted); *Corey Z. v. Saul*, No. 18 CV 50219, 2019 WL 6327427, at *3-5 (N.D. Ill. Nov. 26, 2019) ("Here, despite Plaintiff's testimony that he suffered daily migraine headaches, coupled with medical record evidence of the same, the ALJ never mentioned listing 11.02 and never analyzed whether Plaintiff's migraine headaches equaled this listing.… First, the ALJ never relied on or referenced the state agency physicians' opinions or the completed Disability Determination forms in her listings analysis. While the ALJ discussed the state agency physicians' opinions later in the ALJ's RFC analysis, the ALJ never mentioned listings when discussing those opinions. Second, even if the ALJ relied on the state agency physicians' opinions, none of those opinions addressed listing 11.02.… And even if the state agency physicians considered this listing behind the scenes, the physicians provided no explanation or analysis, making it impossible for this Court to follow their reasoning."); *Grancea v. Saul*, No. CV 18-1357, 2019 WL 4393371, at *2-4 (W.D. Pa. Sept. 13, 2019) ("[T]here is evidence in the record which indicates that Grancea satisfies these requirements [for equaling listing 11.02]: she has experienced migraines more than once weekly and the migraines cause significant interference with her activity during the day. The ALJ's decision prevents this Court from conducting a meaningful, albeit deferential, review."); *Crewe v. Comm'r of Soc. Sec.*, No. 17-CV-1309S, 2019 WL 1856260, at *4-7 (W.D.N.Y. Apr. 25, 2019) ("Here, the ALJ's brief

acknowledgment of Plaintiff's headaches in the RFC determination does not suffice as consideration of 'the effect of all impairments, including non-severe impairments,' as Defendant claims. Further, Plaintiff's impairment—for which she has received considerable treatment—is not described in the Listings, and contemporaneous Agency guidance suggests it should be compared with a closely analogous Listed impairment. POMS § DI 24505.015. However, the ALJ did not conduct even a cursory medical equivalence analysis."); *Worley v. Berryhill*, No. 7:18-CV-16-FL, 2019 WL 1272540, at *3-7 (E.D.N.C. Feb. 4, 2019) ("Here, the ALJ did not mention Listing 11.02, let alone discuss Plaintiff's migraine impairment in light of the listing's medical criteria. The ALJ's decision is devoid of any reasoning to support his determination that Plaintiff's migraine impairment does not medically equal a listing. Consequently, the court is precluded from conducting a meaningful review to determine whether the Commissioner's decision is supported by substantial evidence in the record and based on the proper legal standards."), *report and recommendation adopted*, No. 7:18-CV-16-FL, 2019 WL 1264870 (E.D.N.C. Mar. 19, 2019). *See also Adams v. Saul*, No. 5:19-CV-00057-FL, 2020 WL 1042144, at *8-9 (E.D.N.C. Jan. 30, 2020) ("If the Commissioner posits that SSR 17-2[p] requires an ALJ to articulate specific evidence supporting his or her finding that the individual's impairment(s) medically equals a listed impairment, but relieves an ALJ of the same reasoning where medical equivalence is not found, the court is unpersuaded. A lack of explanation why an impairment fails to equal medically a Listing impairment may frustrate meaningful judicial review when the record contains evidence of symptoms that might equal, in severity and duration, some or all the criteria of a listed impairment.") (internal citation and footnote omitted), *report and recommendation adopted*, No. 5:19-CV-57-FL, 2020 WL 1042058 (E.D.N.C. Mar. 3, 2020); *Mann*, 100 F. Supp. 3d at 718-21 ("Based on this medical evidence, Mann was entitled to have the ALJ conduct an analysis under Listing 11.03. If the ALJ had conducted such an analysis, her conclusion would be upheld so long as it fell within the 'available zone of choice.' Unfortunately, the ALJ did not consider Listing 11.03, meaning there was no 'choice' and, therefore, no 'zone.' I find that remand is necessary with directions that the ALJ consider whether Mann's migraine headaches meet or equal Listing 11.03.") (citation omitted).

In sum, the ALJ's failure to make a specific determination as to whether Plaintiff's headache impairment is equal to listing 11.02 prevents the court from making a meaningful review, and requires a finding that there is not substantial evidence to support the ALJ's general conclusion that Plaintiff "does not have an impairment or combination of impairments that meets or equal the severity of one of the listed impairments." (Tr. 20) Accordingly, the Commissioner's decision will be reversed, and the case will be remanded for a specific determination of medical equivalency regarding listing 11.02.

The ALJ's RFC Determination.

Because the court is remanding the case for a new step-three determination, it declines to address Plaintiff's contention that the ALJ's RFC finding is not supported by sufficient medical evidence as it relates to the frequency and severity of Plaintiff's headaches. The RFC determination is made between steps three and four. *See* 20 C.F.R. § 404.1520(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity."); 20 C.F.R. § 416.920(a)(4) (same).

APPOINTMENTS CLAUSE

Relying on *Lucia v. Securities and Exchange Commission*, 138 S. Ct. 2044 (2018), Plaintiff seeks a remand of his case for a new hearing on the grounds that the ALJ presiding over his claim is an inferior officer under the Appointments Clause who was not constitutionally appointed consistent with that provision. However, at no point in the administrative process—whether in his initial application for benefits, on reconsideration, in his hearing before the ALJ, or before the Appeals Council—did Plaintiff ever raise this issue. Plaintiff has therefore waived or forfeited this constitutional challenge by failing to exhaust the issue below. *See Davis v. Saul*, __ F.3d __, No. 18-3422, 2020 WL 3479626 (8th Cir. June 26, 2020) (Social Security disability insurance benefits claimants waived for appellate review Appointments Clause challenge to appointments of ALJs who denied benefits applications, since claimants failed to raise the issue during agency proceedings).

CONCLUSION

For the various reasons discussed above, the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, the ALJ did not make a proper assessment at step three of the 5-step sequential analysis as to whether Plaintiff's severe impairment (headache) medically equals listing 11.02. This finding makes it unnecessary to discuss the ALJ's allegedly erroneous RFC determination at this time. Finally, Plaintiff waived or forfeited his Appointments Clause challenge by failing to exhaust the issue below.

IT IS THEREFORE ORDERED:

1.      Plaintiff's motion for an order reversing the Commissioner's decision (Filing 16) is granted to the following extent:

The decision of the Commissioner is reversed pursuant to sentence four of 42 U.S.C. § 405(g), and the case is remanded for further proceedings consistent with the foregoing opinion.

2.      Defendant's motion for an order affirming the Commissioner's decision (Filing 19) is denied.

3.      Final judgment will be entered by separate document.

Dated this 15th day of July, 2020.

BY THE COURT:

*Richard G. Kopf*

Richard G. Kopf
Senior United States District Judge